**Electronically Filed**
**Supreme Court**
**SCOT-20-0000309**
**29-JUN-2021**
**10:33 AM**
**Dkt. 109 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---oOo---

_____

IN THE MATTER OF THE APPLICATION OF
HAWAIIAN ELECTRIC COMPANY, INC.

FOR WAIVER OF THE NA PUA MAKANI WIND PROJECT FROM THE
FRAMEWORK FOR COMPETITIVE BIDDING, AND APPROVAL
OF THE POWER PURCHASE AGREEMENT FOR RENEWABLE AS-AVAILABLE
ENERGY WITH NA PUA MAKANI POWER PARTNERS, LLC.

_____

APPEAL FROM THE PUBLIC UTILITIES COMMISSION
(AGENCY DOCKET NO. 2013-0423)

SCOT-20-0000309

JUNE 29, 2021

RECKTENWALD, C.J., NAKAYAMA, McKENNA, AND WILSON, JJ.,
AND CIRCUIT JUDGE KURIYAMA, ASSIGNED BY REASON OF VACANCY

OPINION OF THE COURT BY McKENNA, J.

## I.  Introduction

In this case, we decide whether the Public Utilities

Commission ("PUC") abused its discretion in deciding not to re-

open a December 2014 order ("Order No. 32600") upon allegations

brought five years later that changed circumstances warranted

relief from the order.  Order No. 32600 approved a Purchase Power Agreement ("PPA") in which Hawaiian Electric Company ("HECO") agreed to purchase wind energy generated by Na Pua Makani ("NPM") on a wind farm to be constructed in Kahuku, on the island of O'ahu.  The PPA priced wind energy at 14.998 cents per kilowatt hour ("kWh"), which the PUC found to be reasonable. The PUC also exempted the project from its Competitive Bidding Framework.

Five years later, in 2019, Life of the Land ("LOL") sought to re-open Order No. 32600, alleging that (1) NPM's incidental take license ("ITL") over the Hawaiian hoary bat was untimely obtained in May 2018, in violation of the PPA; (2) that the 14.998 cents per kWh was unreasonable in light of a Scientific American blog article noting that wind energy prices nationwide had fallen by 2017; and (3) that the PUC's order did not analyze the greenhouse gas emissions ("GHG emissions") impact of the project, in violation of Hawai'i Revised Statutes ("HRS") § 269-6(b) (2007 & Supp. 2011).  Having never appealed Order No. 32600 or timely moved for reconsideration or rehearing of that order under the PUC's rules, LOL instead sought to re-open the order with reference to Hawai'i Rules of Civil Procedure ("HRCP") Rule 60(b) (2006), specifically under subsections (4), (5), and (6) of that rule.  Under HRCP Rule 60(b), a court may provide relief from a judgment when "(4) the judgment is void; (5) . . . it is

no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment." The PUC's rules do allow the agency to refer to the HRCP "for guidance" whenever the PUC's rules are "silent on a matter."

As for why Order No. 32600 was "void" under HRCP Rule 60(b)(4), LOL argued that the PPA was voided under its own terms when NPM obtained the allegedly untimely ITL. LOL argued that the ITL was a "Land Right" that NPM needed to obtain 120 days after the execution of the PPA (or 120 days after a later-executed amended PPA), as opposed to a "Governmental Approval" that NPM needed to obtain by the date construction commenced. LOL also argued that the parties' representations regarding these deadlines under the PPA must be "strictly construed" because the PUC had exempted them from the Competitive Bidding Framework. LOL also argued that Order No. 32600 was void because it contained no analysis of the GHG emissions impact of the wind farm project, as required under HRS § 269-6(b).

As for why it would be "inequitable" for Order No. 32600 to have prospective effect under HRCP Rule 60(b)(5), LOL argued that the 14.998 cent price per kWh of wind energy was not reasonable, because a Scientific American blog article noted that wind prices under PPAs nationwide had fallen to two cents per kWh by 2017. LOL also argued that Order No. 32600 was

inequitable because it contained no analysis of the GHG emissions impact of the wind farm project, as required under HRS § 269-6(b).

As for "any other reason justifying relief from the operation of the judgment" under HRCP Rule 60(b)(6), LOL argued that Order No. 32600 contained no analysis of the GHG emissions impact of the wind farm project, as required under HRS § 269-6(b).

HECO and the Consumer Advocate[1] opposed LOL's motion for relief, arguing that resort to HRCP Rule 60(b) for guidance was not necessary, because LOL should have timely sought relief under an existing PUC administrative rule, HAR § 16-601-137 (2019), which sets forth the procedure for moving for rehearing or reconsideration of a PUC order. They also argued that LOL failed to timely appeal Order No. 32600 to the ICA. The PUC agreed.

After a hearing, the PUC denied LOL's motion for relief in Order No. 37074. The PUC concluded it was without jurisdiction

---

[1] The Consumer Advocate was an ex officio party to these proceedings pursuant to HRS § 269-51 (2007 & Supp. 2014) ("The executive director of the division of consumer advocacy shall be the consumer advocate in hearings before the public utilities commission. The consumer advocate shall represent, protect, and advance the interests of all consumers . . . of utility services. . . . The consumer advocate shall have full rights to participate as a party in interest in all proceedings before the public utilities commission."). See also Hawai'i Administrative Rules ("HAR") § 6-601-62(a) (2019) ("The consumer advocate is, ex officio, a party to any proceeding before the commission.").

to consider LOL's motion, because LOL had not timely appealed the order to the ICA under HRS § 269-15.5 (2007 & Supp. 2014), within thirty days of the issuance of the order.  Alternatively, the PUC ruled that LOL's motion for relief was an untimely motion for rehearing or reconsideration under HAR § 16-601-137, which was required to have been filed within ten days of service of Order No. 32600.  The PUC also ruled that LOL did not have "standing," in any event, to raise the issue of HECO and NPM's compliance with the PPA in obtaining an ITL, as LOL was neither a party nor intended third-party beneficiary of the PPA.  The PUC concluded that HECO and NPM were free to invoke contractual remedies to address any alleged delay in obtaining the ITL.

LOL timely appealed Order No. 37074, raising the following points of error:

> The PUC reversibly erred in the following ways:
>
> (1)  by concluding it lacked jurisdiction to consider [LOL's] motion for relief on the basis that it is untimely under a strict construal of statutes creating a right of appeal and rules governing reconsideration.
> . . . .
> (2) by treating [LOL's] motion for relief pursuant to HAR § 16-601-1 as an untimely filed or failed motion for reconsideration.
> . . . .
>  (3)  by failing to re-open proceedings to address HECO and NPM's failure to obtain land rights under amended PPA § 11.2 or, alternatively, to strictly construe parties' failure to obtain site control as required by Part IV.B.8 of the competitive bidding framework, from which parties had obtained a waiver.
> . . . .
> (4) by treating the approval of the amended PPA as a contract between private parties and engaging in contract interpretation in concluding the meaning of the amended PPA approval.
> . . . .

(5) by delegating its powers to interpret its order approving the PPA and amendments to the same private parties – HECO and NPM – as a consequence of concluding that its approval of the PPA can be amended through "contractual mechanisms" available exclusively to the private parties to the contract.

We hold that the PUC did not abuse its discretion in declining to turn to HRCP Rule 60(b) to re-open Order No. 32600. First, as to the GHG emissions issue, the absence of a GHG emissions analysis was readily apparent in Order No. 32600 when it was filed in December 2014. LOL could have timely moved for rehearing or reconsideration of the order under HAR § 16-601-137. LOL could have also timely appealed the order under HRS § 269-15.5. An HRCP Rule 60(b) motion is not a substitute for a timely appeal. Therefore, the PUC properly declined to re-open Order No. 32600 to address GHG emissions. Second, as to the reasonableness of wind energy prices, the Scientific American blog article does not provide the "extraordinary circumstances" necessary to invoke relief under HRCP Rule 60(b). Third, any alleged failure of HECO or NPM to timely obtain an ITL does not "void" the PPA and Order No. 32600. Such an argument, assuming LOL has standing to raise it, finds no basis in the plain language of the PPA or Order No. 32600. Therefore, the PUC did not abuse its discretion by declining to re-open Order No. 32600 using HRCP Rule 60(b) for guidance in analyzing this claim. As LOL provided no justification for obtaining relief from Order No. 32600, we affirm the PUC's Order No. 37074.

## II.  Background

### A.  HECO's Application

On December 12, 2013, HECO filed an application with the PUC requesting an order approving a waiver of the NPM wind farm project from the Competitive Bidding Framework,[2] approving a PPA between HECO and NPM, finding that the purchased energy charges to be paid by HECO pursuant to the PPA (14.998 cents per kWh) were reasonable, and finding that the purchased power arrangements under the PPA were prudent and in the public interest.  HECO also notified the PUC that it would conduct an Interconnection Requirements Study and later seek PUC approval of the construction of overhead power lines to connect the wind farm to HECO's power grid.

The PPA was dated October 3, 2013 and attached as Exhibit 1 to HECO's application.  Relevant to this appeal, the PPA contained the following definitions of "Governmental Approvals" and "Land Rights":

> "Governmental Approvals":  All permits, licenses, approvals, certificates, entitlements and other

---

[2]  Under the Competitive Bidding Framework, HECO is required to use competitive bidding as the mechanism to acquire future generation resources or a block of generation resources, whether or not such resource has been identified in its Integrated Resource Plan.  See Competitive Bidding Framework, Part II.A.3.  HECO noted, however, that there are "certain circumstances where competitive bidding may not be appropriate, in which case a waiver may be granted" by the PUC.  These circumstances include "when more cost-effective . . . generation resources are more likely to be acquired more efficiently through different procurement processes."  The PUC may waive the Competitive Bidding Framework requirements "upon a showing that the waiver will likely result in a lower cost supply of electricity to the utility's general body of ratepayers, or is otherwise in the public interest."

authorizations issued by Governmental Authorities, as well as any agreements with Governmental Authorities, required for the construction, ownership, operation and maintenance of the Facility and the Company-Owned Interconnection Facilities, and all amendments, modifications, supplements, general conditions and addenda thereto.

"Land Rights":  All easements, rights of way, licenses, leases, surface use agreements and other interests or rights in real estate.

The PPA also contained the following provisions in Article 11, titled "Government Approvals, Land Rights and Compliance with Laws":

11.1  Governmental Approvals for Facility.  Seller shall obtain, at its expense, any and all Governmental Approvals required for the construction, ownership, operation and maintenance of the Facility and the interconnection of the Facility to the Company System.

11.2  Land Rights for Facility.  Seller shall obtain, at its expense, any and all Land Rights required for the construction, ownership, operation and maintenance of the Facility and the interconnection of the Facility to the Company System.  Seller shall provide to Company, no later than the earlier of the Effective Date or 120 Days after the Execution Date, copies of the documents establishing (i) the right of Seller to construct, own, operate and maintain the Facility on the Site and (ii) any other Land Rights required for such construction, ownership, operation and maintenance.  If required by Company and not prohibited by Law Seller shall record a memorandum or short form of such documents.

Article 22.2(D) contained the following representation by the Seller (NPM) regarding when it would obtain Governmental Approvals and Land Rights:

Seller represents, warrants and covenants that: . . .  As of the commencement of construction, Seller shall have obtained (1) all Land Rights and Governmental Approvals necessary for the construction, ownership, operation and maintenance of the Company-Owned Interconnection Facilities and (ii) all Governmental Approvals necessary for the construction, ownership, operation and maintenance of the Facility.

Further, the PPA contained an Attachment K, titled "Guaranteed Project Milestones," and an Attachment L, titled "Reporting Milestones," which were placeholder documents pending the results of the Interconnection Requirements Study.  (After the Interconnection Requirements Study was finished, Attachment K to the Amended PPA stated that August 31, 2019 was the "Guaranteed Commercial Operations Date," and Attachment L to the Amended PPA stated that December 31, 2017 was the "Construction Start Date," whereby "Seller shall obtain and provide Company all permits, licenses, easements and approvals to construct the Company-Owned Interconnection Facilities.")

Regarding how the PPA may be voided, Article 12.5(B) allows HECO, prior to the effective date, to "declare the Agreement null and void if . . . Seller is in breach of any of its representations, warranties and covenants under the Agreement, including but not limited to, (1) the provisions of Section 22.2(C) requiring Seller to have obtained all Land Rights necessary for the construction, ownership, operation and maintenance of the Facility for the Initial Term. . . ."  The PPA, however, contained grace periods for NPM of up to 90 days where a "guaranteed project milestone" deadline is missed.  If NPM still did not meet a guaranteed project milestone even with the applicable grace period, article 13.4(B) of the PPA allowed

HECO the right to terminate the Agreement after 180 days of NPM's failure.

Lastly, the PPA contained a provision, Article 29.22, titled "No Third Party Beneficiaries," which stated the following:

> Nothing expressed or referred to in this Agreement will be construed to give any person or entity other than the Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement. This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the Parties and their successors and permitted assigns.

**B. LOL's Motion to Intervene**

On December 23, 2013, LOL moved to intervene in the matter. LOL identified itself as "non-profit, public interest, environmental group" founded in 1970. Since 1970, LOL has followed energy issues and has intervened in energy dockets before the PUC.

LOL noted that certain North Shore community members initially supported wind farms but had grown weary of them. LOL also expressed concern over GHG emissions impacts as follows:

> [T]he major greenhouse gas emission associated with wind farms occurs in its development phase. Raw materials such as limestone, chalk, shale, clay, and sand are quarried, crushed, finely ground, and blended in a high temperature process which produces a hard nodular material called "clinker." The production of clinker is a major source of greenhouse gas emissions.

On March 21, 2014, the PUC issued Order No. 31998 denying LOL's motion to intervene and granting it participant status instead. The PUC identified the issues in the docket as the

following, with LOL's participation limited to addressing just the first and fourth issues:

> 1.  Whether the [PUC] should approve HECO's request for a waiver from Parts II.A.3.b(iii) and II.A.3.d of the [Competitive Bidding] Framework.
>
> 2.  Whether the Power Purchase Agreement for Renewable As-Available Energy, dated October 3, 2013, by and between HECO and Na Pua Makani Power Partners, for the Project should be approved.
>
> 3.  Whether the purchased energy charges to be paid by HECO pursuant to the PPA are reasonable.
>
> 4.  Whether the purchased power arrangements under the PPA, pursuant to which HECO purchases energy on an as-available basis from Na Pua Makani are prudent and in the public interest.
>
> 5.  Whether HECO should be authorized to include the purchased energy charges (and related revenue taxes) that HECO incurs under the PPA in and through HECO's ECAC [Energy Cost Adjustment Clause], to the extent such costs are not included in base rates.
>
> 6.  Whether the 46 kV line extension that is included as part of Company-Owned Interconnection Facilities should be constructed above the surface of the ground, pursuant to HRS § 269-27.6(a).

## C.    Statements of Position

On June 20, 2014, LOL filed its "Statement of Position." It did not contest the project's waiver from the Competitive Bidding Framework, stating, "This project is a low cost renewable project."  With respect to whether the PPA was prudent and in the public interest, LOL stated it had "chosen to focus on one interesting issue:  party sales."  LOL noted that the PPA prohibited sales of energy from the facility to any third party. LOL proposed selling excess wind-generated energy to hydrogen-making facilities to provide alternative energy to the

transportation sector. LOL did not follow up on its concerns over GHG emissions from the production of "clinker."

**D.    The PUC's Decision and Order No. 32600**

On December 31, 2014, the PUC issued its Order No. 32600. Relevant to this appeal, the Order (1) approved HECO's request for a waiver from the Competitive Bidding Framework; (2) approved, with modifications, the PPA for the project; and (3) deferred action on HECO's request to construct 46 kV above-ground lines pending the filing of a completed Interconnection Requirements Study. The PUC found and concluded that the levelized price of 14.998 cents per kWh of wind energy was reasonable.

Relevant to this appeal, the PUC Order stated the following, under a sub-section titled "Compliance with Laws and Regulations":

> Under Article 11 of the PPA, NPM is responsible for obtaining, at its expense, any and all necessary permits, government approvals, and land rights for the construction and operation of the Facility, including, but not limited to, rights-of-way, easements, or leases. According to HECO, prior to commencement of construction of the Company-Owned Interconnection Facilities, NPM shall provide the necessary permits, government approvals, and land rights for construction, ownership, operation, and maintenance of Company-Owned Interconnections Facilities.

LOL did not move for rehearing or reconsideration of Order No. 32600. LOL did not appeal Order No. 32600 to the ICA.

**E. The Amended and Restated Power Purchase Agreement Dated August 12, 2016 and Interconnection Requirements Study, Filed with the PUC on September 15, 2016; and the PUC's Decision and Order No. 34866**

Almost two years after the PUC issued Order No. 32600, on September 15, 2016, HECO filed an application seeking the PUC's approval of the construction of above-ground power lines to connect the wind farm to HECO's grid. HECO attached an Amended and Restated Power Purchase Agreement Dated August 12, 2016 ("Amended PPA")[3] which incorporated the completed Interconnection Requirements Study.

On October 13, 2017, the PUC issued its Decision and Order No. 34866 approving HECO's request to construct the above-ground 46 kV line extension and closed the docket.

**F. The Proceedings Giving Rise to this Appeal: LOL's Motion for Relief from Order No. 32600**

**1. LOL's Motion for Relief from Order No. 32600**

Almost two years later, on September 11, 2019, LOL filed a "Motion for Relief from Order No. 32600" pursuant to HAR § 16-601-1 (2019) and HRCP Rule 60(b). HAR § 16-601-1 is titled "Purpose," and it states the following:

> These rules govern the practice and procedure before the public utilities commission, State of Hawaii. They shall be liberally construed to secure the just, speedy, and inexpensive determination of every proceeding. Whenever this chapter is silent on a matter, the commission or hearings officer may refer to the Hawaii Rules of Civil Procedure for guidance.

---

[3] The provisions of the PPA relevant to this appeal are not materially different in the Amended PPA.

13

LOL argued that HAR § 16-601-1 allowed the PUC to turn to HRCP Rule 60(b) for guidance because the PUC's rules were silent on the relief LOL sought.

HRCP Rule 60 is titled "Relief from Judgment or Order." Subsection (b) of HRCP Rule 60 governs relief from judgment or order due to "[m]istakes; inadvertence; excusable neglect; newly discovered evidence; fraud, etc." HRCP Rule 60(b) states the following in full:

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken. A motion under this subdivision (b) does not affect the finality of a judgment or suspend its operation. This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or to set aside a judgment for fraud upon the court. Writs of coram nobis, coram vobis, audita querela, and bills of review and bills in the nature of a bill of review, are abolished, and the procedure for obtaining any relief from a judgment shall be by motion as prescribed in these rules or by an independent action.

LOL asserted it was entitled to relief under HRCP Rule 60(b)(4), (5), and (6). First, LOL argued Order No. 32600 was void, for purposes of HRCP Rule 60(b)(4), because NPM obtained

an ITL beyond the deadlines set forth in the PPA. LOL attached the Board of Land and Natural Resources' ("BLNR") May 16, 2018 Findings of Fact, Conclusions of Law, and Decision and Order approving the Final Habitat Conservation Plan and Incidental Take License for the wind project. LOL characterized the ITL as a "Land Right." Under the PPA's (and Amended PPA's) § 11.2 titled "Land Rights for Facility," LOL argued Land Rights must be obtained no later than the earlier of the effective date of the Amended PPA (August 12, 2016) or 120 days after the execution date (December 10, 2016):

> Seller shall obtain, at its expense, any and all Land Rights required for the construction, ownership, operation and maintenance of the Facility and the interconnection of the Facility to the Company System. Seller shall provide to Company, no later than the earlier of the Effective Date or 120 Days after the Execution Date, copies of the documents establishing (i) the right of Seller to construct, own, operate and maintain the Facility on the Site and (ii) any other Land Rights required for such construction, ownership, operation and maintenance. If required by Company and not prohibited by Laws, Seller shall record a memorandum or short form of such documents.

LOL argued that NPM's failure to timely obtain an ITL also violated "the threshold requirements of 'site control' imposed by the Competitive Bidding Framework." LOL quoted Part IV.B.8 of the Competitive Bidding Framework for the following "requirement" of "site control":

> As part of the design process, the utility shall develop and specify the type and form of threshold criteria that will apply to bidders, including the utility's self-build proposals. Examples of potential threshold criteria include requirements that bidders have site control, maintain a specified credit rating, and demonstrate that their proposed technologies are mature.

15

LOL noted that Order No. 32600 approved of the project's waiver from the Competitive Bidding Framework.  As such, LOL argued that HECO and NPM's "representations to the [PUC], including as to the Amended PPA's land rights requirements, are to be strictly construed."  Thus, LOL asserted "[b]ecause the underlying PPA that was subject to the [PUC's] approval is void, so is" Order No. 32600 "approving the PPA."

LOL also argued Order No. 32600 was void, for purposes of HRCP Rule 60(b)(4), because the PUC failed to consider GHG emissions in its Order No. 32600 as HRS § 269-6(b) requires. HRS § 269-6 is titled "General powers and duties," and sub-section (b) provides the following:

> The [PUC] shall consider the need to reduce the State's reliance on fossil fuels through energy efficiency and increased renewable energy generation in exercising its authority and duties under this chapter.  In making determinations of the reasonableness of the costs of utility system capital improvements and operations, the commission shall explicitly consider, quantitatively or qualitatively, the effect of the State's reliance on fossil fuels on price volatility, export of funds for fuel imports, fuel supply reliability risk, and greenhouse gas emissions.  The commission may determine that short-term costs or direct costs that are higher than alternatives relying more heavily on fossil fuels are reasonable, considering the impacts resulting from the use of fossil fuels.

LOL argued that there was no time limit on a Rule 60(b)(4) attack on a judgment, citing International Savings & Loan Association v. Carbonel, 93 Hawai'i 464, 5 P.3d 454 (App. 2000).

As for relief under HRCP Rule 60(b)(5) (whether it would be inequitable for the PUC's Order No. 32600 to have prospective

16

application), LOL argued that two reasons make the order inequitable:  (1) the wind project "did not comply with HRS § 269-6(b) [requiring the PUC to consider the effect of the project on GHG emissions] and therefore harmed [LOL's] property interests in its rights to a clean and healthful environment protected by due process; and, (2) the pricing of the electricity is not reasonable."  As to the GHG emissions issue, LOL noted that Order No. 32600 contained no GHG emissions analysis.  LOL cited to this court's then-recently published cases, Matter of Hawai'i Electric Light Company, 145 Hawai'i 1, 22-23, 445 P.3d 673, 694-95 (2019) ("HELCO") (requiring the PUC to explicitly consider GHG emissions), and In re Application of Maui Electric Company, 141 Hawai'i 249, 253, 271, 408 P.3d 1, 5, 23 (2017) ("MECO") (holding that there is a protectable property interest to "a clean and healthful environment guaranteed by article XI, section 9 and defined by HRS Chapter 269.").

 With respect to the price of wind energy, LOL argued that the 14.998 cents per kWh price of wind energy was unreasonable, pointing to a Scientific American blog post titled "Wind Energy is One of the Cheapest Sources of Electricity, and It's Getting Cheaper," dated August 28, 2017 and authored by Robert Fares, which noted that wind energy could be as inexpensive as two cents per kWh.  The blog post summarized the U.S. Department of Energy's ("DOE") annual Wind Technologies Market Report for

2017. LOL did not attach the Wind Technologies Market Report itself. The report is located on the DOE's website at www.energy.gov/eere/wind/downloads/2017-wind-technologies-market-report. [https://perma.cc/A7PQ-LCLJ] Regarding the two-cent figure, the DOE noted, "Key findings of the report include: . . . . After topping out at 7¢/kWh in 2009, the average levelized long-term price from wind power sales agreements has dropped to around 2¢/kWh – though this nationwide average is dominated by projects that hail from the lowest-priced region, in the central United States." Id.

Lastly, LOL asserted that the lack of findings on GHG emissions also entitled it to relief from Order No. 32600 under Rule 60(b)(6) (the "catch-all" provision). LOL requested a hearing and/or a contested case hearing on its motion for relief.

### 2. HECO's Memorandum in Opposition to LOL's Motion for Relief

On October 15, 2019, HECO filed its memorandum in opposition to LOL's motion for relief. HECO argued the PUC lacked jurisdiction over the motion. HECO explained that the PUC's jurisdiction is set by statute and that it cannot waive deadlines for entertaining untimely appeals in order to enlarge its jurisdiction, citing Tanaka v. Department of Hawaiian Home Lands, 106 Hawai'i 246, 103 P.3d 406 (App. 2004). It asserted

that LOL was required to have appealed Order No. 32600 within 30 days, citing HRS § 269-15.5, HRS § 91-14, HRCP Rule 72(b), and HRAP Rule 4(a).

HECO next argued that "LOL's attempts to shoehorn its appellate issues into HRCP Rule 60 are improper." HECO contended that relief under Rule 60(b) required a showing of "hardship so extreme and unexpected as to justify [a court] in saying that [the moving parties] are the victims of oppression," citing United States v. Swift & Co., 286 U.S. 106, 119 (1932). HECO also contended that LOL did not move for relief under HRCP Rule 60(b) within a "reasonable time." HECO pointed out that the reasonableness of wind energy prices and the absence of a GHG emissions analysis would have been apparent when Order No. 32600 was issued in December 2014; LOL's motion for relief, however, was filed five years later. Second, HECO maintained that, by December 10, 2016 (120 days after the execution of the Amended PPA), it would also have been apparent that an ITL for the wind farm project had not yet been obtained; LOL's motion for relief, however, was filed almost three years past that date.

HECO next argued that, even if the PUC entertained LOL's motion for relief, the motion would nonetheless fail on the merits. First, HECO argued that LOL improperly characterized the ITL as a "Land Right" under § 11.2 of the PPA when it was

19

actually a "Governmental Approval" under § 11.1 of the PPA. HECO points out that § 11.2 of the PPA defines "Land Rights" as "[a]ll easements, rights of way, licenses, leases, surface use agreements and other interests or rights in real estate." LOL had argued Land Rights must be obtained within 120 days of the execution of the PPA, or by December 10, 2016. "Governmental Approvals," on the other hand, are defined in § 11.1 as "[a]ll permits, licenses, approvals, certificates, entitlements and other authorizations issued by Governmental Authorities, as well as any agreements with Governmental Authorities, required for the construction, ownership, operation and maintenance of the Facility and the Company-Owned Interconnection Facilities. . . ." Governmental Approvals have no express deadline set forth in the PPA, but HECO footnoted, "Governmental Approvals must be completed by the Commercial Operations Date. See generally HECO Application, Ex. 1, Article 13 (Oct. 3, 2013)." HECO pointed out that the ITL was a Governmental Approval because it was triggered by the construction and operation of the wind turbines and issued by the BLNR.

HECO argued that even if the ITL is considered a "Land Right," a delay in obtaining it would not constitute a material breach of the PPA or justify voiding the entire PPA. HECO stated that neither it nor NPM intended for a delay in obtaining the ITL to constitute a material breach of the PPA. In any

20

event, HECO argued, LOL did not have standing to argue that the PPA has been breached.

As to LOL's argument that NPM has failed to obtain "site control" under the Competitive Bidding Framework, HECO presented three counter-arguments. First, the PUC approved the waiver of the project from the Competitive Bidding Framework, so the portion of the framework quoted by LOL does not apply. Second, HECO pointed out that the portion of the framework quoted by LOL does not require "site control"; rather, it lists "site control" as an example of a "potential threshold criteria" a utility can consider including in the bidding process. Third, HECO maintained the NPM has actual site control: the BLNR approved a lease of land to NPM for the project on October 14, 2016.

Moreover, HECO argued that HRCP Rule 60(b)(4) would apply to "void" Order No. 32600 only if the PUC "lacked jurisdiction of either the subject matter or the parties or otherwise acted in a manner inconsistent with due process." HECO argued the PUC indisputably had jurisdiction over the issues and parties in this matter, which involved reviewing a PPA of a public utility. HECO also argued that any due process argument was waived when LOL failed to timely appeal Order No. 32600.

HECO next argued that LOL did not explain how analysis of GHG emissions, had it been included in Order No. 32600, would have changed the PUC's decision. HECO pointed out that the BLNR

21

found that the wind energy project "would . . . eliminate about one million tons of $CO_2$ over twenty years." HECO pointed out that in other dockets, LOL had strongly advocated for wind power (among other alternative energy sources, like solar power). HECO argued LOL could not invoke equity in its motion for relief while taking a position on wind power inconsistent with its past positions.

Finally, HECO argued that its wind energy price is reasonable. It asserted the PUC should not consider LOL's blog article on wind power costs in the interior United States, which did not discuss wind generation in Hawai'i.

### 3. The Consumer Advocate's Response to LOL's Motion for Relief

On October 15, 2019, the Consumer Advocate filed its response to LOL's motion for relief, recommending that the PUC deny the motion on procedural grounds. The Consumer Advocate argued that LOL was allowed to participate on the issue of whether the PPA was prudent and in the public interest, which would have included the provisions concerning when the parties would obtain an ITL. The Consumer Advocate stated that any challenge to these provisions after the PPA was approved should have been brought in a timely motion for reconsideration under HAR § 16-601-137. The deadline for filing such a motion was ten days after the service of Order No. 32600 upon LOL.

22

As to LOL's argument that HRCP Rule 60(b) applied, the Consumer Advocate disagreed, stating that the PUC's administrative rules are not "silent" on the relief LOL requested.  In addition to filing a timely motion for reconsideration under HAR § 16-601-137, LOL could have turned to Subchapter 5 of the PUC's rules (governing complaints and PUC investigations), and/or Subchapter 16 of the PUC's rules (governing declaratory orders).

The Consumer Advocate warned, "Allowing this motion would set a dangerous precedent by allowing a party to question any prior [PUC] decision outside of the timelines for appeal set forth in the [PUC's] rules of practice and procedure, and thereby undermine the authority of the [PUC] to make final and effective rulings."

The Consumer Advocate stated it was "not clear that LOL has fully supported all of its assertions" regarding why Order No. 32600 was void and/or inequitable.  The Consumer Advocate did, however, acknowledge that "certain milestones have been missed," such as the March 31, 2019 deadline for installing turbines and generators at the site, and an August 31, 2019 guaranteed commercial operation date.  It noted, though, that the "PPA has terms that allow cure periods for such situations."

Lastly, the Consumer Advocate pointed out that "[i]f it bec[a]me[] evident and supported that there [we]re breaches in

the PPA or other events that are contrary to the public interest, the [PUC] should seek to timely investigate those matters" using its authority under HRS § 269-7(a). HRS § 269-7 (2007) is titled "Investigative powers." Subsection (a) provides the following:

> The public utilities commission and each commissioner shall have power to examine into the condition of each public utility, the manner in which it is operated with reference to the safety or accommodation of the public, the safety, working hours, and wages of its employees, the fares and rates charged by it, the value of its physical property, the issuance by it of stocks and bonds, and the disposition of the proceeds thereof, the amount and disposition of its income, and all its financial transactions, its business relations with other persons, companies, or corporations, its compliance with all applicable state and federal laws and with the provisions of its franchise, charter, and articles of association, if any, its classifications, rules, regulations, practices, and service, and all matters of every nature affecting the relations and transactions between it and the public or persons or corporations.

The Consumer Advocate concluded its response by stating a hearing on LOL's motion for relief was not necessary, and that a contested hearing was precluded, because the PUC's docket for the wind project had already been closed.

### 4. Further Briefing on the Motion for Relief

LOL requested leave to file replies to HECO and the Consumer Advocate. The PUC granted the request and also allowed HECO and the Consumer Advocate to further respond. The PUC also set LOL's motion for relief on for hearing on November 22, 2019.

On November 14, 2019, LOL filed replies to HECO and the Consumer Advocate. In its reply to HECO, LOL raised the argument that Order No. 32600 was void, for purposes of HRCP

24

Rule 60(b)(4), because the PUC did not analyze the wind project's GHG emissions impact and, therefore, violated LOL's due process rights under MECO.  LOL argued this due process right was not fully clarified until the Hawaiʻi Supreme Court extended MECO in HELCO, a case that was not published until 2019.  LOL contended that the PUC has an independent obligation to explicitly consider GHG emissions and cannot rely on the BLNR's analysis of GHG emissions in the ITL.  LOL also stated it was not raising the allegedly delayed ITL as a breach of the PPA; rather, LOL raised the parties' noncompliance with the PPA as a violation of the PUC's approval of the PPA.  Therefore, LOL contended, contract concepts such as standing, breach, and the parties' intent were irrelevant.

In its reply to the Consumer Advocate, LOL stated that it could not have sought relief under HAR § 16-601-137, because the operative facts in LOL's motion were not known 10 days from the date of service of Order No. 32600.  LOL also argued that it could not seek relief from Order No. 32600 through a declaratory order, because the agency declaratory order process was "not intended to allow review of concrete agency decisions for which other means of review are available," citing Citizens Against Reckless Development v. Zoning Board of Appeals, 114 Hawaiʻi 184, 197, 159 P.3d 143, 156 (2007).  Lastly, LOL acknowledged that the PUC could sua sponte investigate a public utility, but LOL

25

noted that the PUC had not opened an investigation into this matter.

On November 19, 2019, HECO and the Consumer Advocate filed their reply briefs responding to LOL's reply briefs. HECO emphasized that LOL "is unable to identify any case that supports its jurisdictional arguments; any case that suggests it can raise an alleged failure to analyze greenhouse ga[ses] ('GHG') where it cannot identify GHG harms; or any case that suggests its Motion was brought in a 'reasonable time.'" HECO continued, "Nor has LOL identified any authority that supports its substantive positions."

For its part, the Consumer Advocate argued that LOL could have raised the GHG emissions issue upon a timely motion for reconsideration of Order No. 32600, because LOL was also the organization raising GHG emissions issues in MECO and HELCO. In other words, LOL did not have to wait until the publication of this court's opinions in MECO and HELCO to continue raising the issue in PUC dockets. The Consumer Advocate also urged the PUC not to entertain LOL's motion for relief, brought years after the PUC's Order No. 32600, as doing so would inject uncertainty into utility regulation and chill investment, including renewable energy investment, in Hawai'i. The Consumer Advocate argued that the PUC's orders should not be rendered "void" based on facts or circumstances that occur after an order is issued.

26

The Consumer Advocate stressed that the PUC should act upon new facts or circumstances through its investigative powers.

### 5.  The PUC's Decision and Order No. 37074

After a November 22, 2019 hearing on LOL's motion for relief, the PUC denied the motion in its Order No. 37074, filed on April 16, 2020.  The Order noted in the introduction and conclusion that the PUC "is carefully monitoring the Project development and intends to follow up with HECO and [NPM], outside of this proceeding, to inquire whether any violations of the PPA] have occurred, and if so, will take appropriate action."

The PUC concluded that it lacked jurisdiction to rule on LOL's motion for relief under Tanaka, 106 Hawai'i 246, 103 P.3d 406.  This was because HRS § 269-15.5 (the statute governing appeals from PUC orders at the time of the December 2014 Order No. 32600) required LOL to have appealed Order No. 32600 to the ICA within 30 days.  Pursuant to Tanaka, the PUC stated that LOL's failure to timely appeal Order No. 32600 deprived it of jurisdiction to hear further matters related to the order, including LOL's motion for relief.  The PUC also noted that HAR § 16-601-137 required any motion for relief from Order No. 32600 to have been filed "within ten days after the decision or order is served upon the party. . . ."

27

The PUC addressed LOL's argument that LOL could not have known, in the days and weeks after Order No. 32600 issued, that the ITL would not be obtained until 2018.  The PUC countered that similar circumstances existed in <u>Tanaka</u>, where the defendant in that case could not have known, at the time of a DHHL order terminating his lease for criminal activity, that his criminal conviction would be later vacated.  The PUC thus rejected "any argument by LOL that the issuance of the Incidental Take License somehow tolled the HAR § 16-601-137 reconsideration deadline. . . ."

The PUC also rejected LOL's argument that "failure to comply with [the PPA] is not being analyzed as a breach of contract between private parties, but rather, as a violation of the [PUC's] approval."  The PUC stated that it had approved the PPA as a whole, "which included the various contractual mechanisms and remedies within the PPA to address any such delays."  The PUC noted that neither HECO nor NPM elected to invoke the contractual mechanisms and remedies within the PPA. Further, the PUC continued, the ITL is "better defined as a 'Governmental Approval,' rather than a 'Land Right,' under the plain language of the PPA, implicitly concluding that the ITL was therefore not untimely obtained.

The PUC stated that, in any event, any alleged delay was "not relevant under the circumstances, as LOL lacks standing to

assert a breach of the PPA, and thus could not have brought a motion for reconsideration . . . ."  The PUC stated that LOL was neither a party to the PPA nor an intended third-party beneficiary of the PPA.  Moreover, the PUC continued, even if the delay did toll the HAR § 16-601-137 deadline, "LOL waited nearly a year and a half [after the May 16, 2018 ITL was issued to] fil[e] its Motion for Relief on September 11, 2019."

Lastly, the PUC concluded that its administrative rules are not silent on the matters raised in LOL's motion because HAR § 16-601-137 applied; therefore, there was no need for LOL to incorporate HRCP Rule 60(b) through HAR § 16-601-1.  The PUC pointed out that LOL could have challenged the PUC's Order No. 32600 with respect to GHG emissions and energy pricing when the order was issued, which were both issues that were known at the time of the filing of the order.  Thus, the PUC concluded LOL's motion for relief constituted an untimely motion for reconsideration of Order No. 32600.  In any event, the PUC continued, HAR § 16-601-1 permits, but does not require, the PUC to turn to the HRCP for guidance.  The PUC also favorably repeated the Consumer Advocate's point that LOL could have filed a complaint under HAR § 16-601, Subchapter 5, or a petition for declaratory relief under HAR § 16-601, Subchapter 16.

## G. LOL's Direct Appeal of Order No. 37074

On April 27, 2020, LOL filed a timely notice of appeal of Order No. 37074 to this court.

## H. Jurisdictional Statements

### 1. HECO's Statement Contesting Jurisdiction

On July 6, 2020, HECO filed a Statement Contesting Jurisdiction. HECO argued that this court lacks jurisdiction because LOL failed to appeal Order No. 32600 within 30 days, as it was required to do under HRS § 269-15.5, HRS chapter 602, and HRAP Rule 4(a)(1). HECO again cited Tanaka, 106 Hawai'i 246, 103 P.3d 406, for the proposition that LOL's failure to timely appeal Order No. 32600 divested the PUC of jurisdiction to entertain LOL's motion for relief.

HECO also argued that this court lacks jurisdiction over LOL's appeal of Order No. 37074 because the motion for relief was an impermissible collateral attack on Order No. 32600. Moreover, HECO argued LOL's motion for relief sought to re-litigate the GHG emissions and energy price issues, which could have been timely raised after Order No. 32600 was issued. Lastly, HECO contended that this court lacks jurisdiction over LOL's appeal "for the separate and independent reason that the 2019 proceeding was not a contested case." Under HRS § 269-15.5, "[o]nly a person aggrieved in a contested case proceeding provided for in [HRS chapter 269] may appeal from the order."

30

HECO argued that there is "no statute or rule that requires a hearing on a 'Motion for Relief.'" Therefore, HECO maintained, "the hearing on the Motion for Relief was discretionary," and "there was no contested case." Under HRS § 269-15.5, HECO argued, this court lacks jurisdiction over LOL's appeal, which "should be summarily dismissed."

## 2. LOL's Statement of Jurisdiction

Also on July 6, 2020, LOL filed a Jurisdictional Statement. LOL asserted that this court has jurisdiction over the appeal pursuant to HRS §§ 91-7, 91-14(a), 269-15.5, 269-15.51, 602-5, 632-1, 641-1, and "constitutional provisions for due process and the right to a clean and healthy environment" under Haw. Const. art. I, § 5 and art XI § 9.

LOL argued that it has standing to bring an administrative appeal under the "two-prong standing test" used in HELCO, 145 Hawai'i at 21, 445 P.3d at 691: (1) "one must be a person aggrieved . . . by a final decision and order in a contested case," and (2) "the aggrieved person must have participated in the contested case from which the decision affecting him resulted." LOL contends it is a "person aggrieved" because PUC Order No. 37074 denied LOL's requested relief. Further, LOL asserted that it was a participant in the PUC's contested case proceeding, and that Order No. 37074 "is a final decision in the

31

contested case proceedings for purposes of appeal as it left no further issues to be determined."

LOL concluded its jurisdictional statement by asking this court to "assert its jurisdiction to vacate PUC Order No. 37074 . . . and remand these matters to PUC for further proceedings."

**3. This court possesses jurisdiction over this appeal.**

This court possesses jurisdiction at a minimum to rule on the jurisdictional issue raised in this case. See Beneficial Hawaii, Inc. v. Casey, 98 Hawai'i 159, 164-65, 45 P.3d 359, 364-65 (2002). First, we are not persuaded that the case relied upon by HECO and the PUC, Tanaka, 106 Hawai'i 246, 103 P.3d 406, compels the conclusion that LOL's failure to timely appeal Order No. 32600 divests this court of jurisdiction over this case. The Tanaka case is distinguishable because the appellant in that case did not try to re-open agency proceedings using HRCP Rule 60(b), and the ICA did not decide the case with reference to HRCP Rule 60(b).

In Tanaka, the Hawaiian Homes Commission ("HHC") terminated Raymond T. Tanaka's lease with the Department of Hawaiian Home Lands ("DHHL") after Tanaka was convicted of drug possession. 106 Hawai'i at 247-48, 103 P.3d at 407-08. The HHC notified Tanaka that he had ten days from the date of service of the

order to request reconsideration[4] by the HHC and thirty days to institute proceedings for judicial review in the circuit court under HAPA, HRS chapter 91.  106 Hawai'i at 248, 103 P.3d at 408. Tanaka neither moved for reconsideration nor appealed the decision.  Id.

The following year, the ICA vacated Tanaka's conviction and remanded his case for a new trial.  Id. (citing State v. Tanaka, 92 Hawai'i 675, 994 P.2d 607 (App. 1999)).  A new criminal trial was not held, as the prosecutor moved to nolle prosequi without prejudice.  106 Hawai'i at 249, 103 P.3d at 409.  In 2000 and 2001, Tanaka and his counsel wrote letters to the HHC requesting reinstatement of Tanaka's DHHL lease.  106 Hawai'i at 248-49, 103 P.3d at 408-09.

The HHC denied Tanaka's request.  106 Hawai'i at 249, 103 P.3d at 409.  He appealed the denial to the circuit court, which

---

[4]     The Commission administrative rule setting forth Tanaka's right to seek reconsideration or rehearing was HAR § 10-5-42 (1998), which stated the following:
> (d) The commission may entertain a written petition to reconsider or re-hear its final order, decision or ruling. The petition shall be determined with reasonable expedition so that the aggrieved party may have timely opportunity to appeal.  Denial of such petition shall be in writing with the reasons stated therefore.
> (e) Petition to reconsider or re-hear any final order, decision or ruling of the commission shall be filed not later than ten days after a person is served with a certified copy of the final decision and order of the commission.

33

affirmed the HHC. Id. Tanaka then appealed the circuit court's judgment to the ICA. Id.

The ICA concluded that Tanaka's "failure to appeal from the Commission's December 1998 Final Order left the Commission without jurisdiction to act on Tanaka's 2000 and 2001 requests for reconsideration." Id. Further, the ICA held that the Commission was without jurisdiction to even hold the November 2001 proceeding because "it was not a separate 'contested case hearing'" under HRS § 91-14(a). Id. Lastly, the ICA concluded that "a party's failure to timely request an agency review hearing not only bars the agency from considering that request, but also precludes the circuit court from considering an appeal of the administrative decision. Id. (quoting Association of Apt. Owners of the Governor Cleghorn v. M.F.D., Inc., 60 Haw. 65, 68-70, 587 P.2d 301, 304 (1978)). The ICA thus vacated the circuit court's judgment and remanded the case to the circuit court for an order dismissing the appeal in the circuit court. 106 Hawai'i at 252, 103 P.3d at 412.

During the course of its opinion, the ICA footnoted the following:

> Tanaka argues on appeal that the [Commission] had jurisdiction to consider his request for reinstatement because "substantially changed circumstances exist," i.e., the dismissal of his criminal charges. However, Tanaka offers no authority to support this position and, as we have pointed out, there appears to be no authority for such late review.

106 Hawai'i at 250 n.8, 103 P.3d at 410 n.8. This footnote highlights the distinction between the Tanaka case and this one. While both sought a re-opening of agency proceedings due to substantially changed circumstances, Tanaka "offer[ed] no authority to support this position," while LOL asks this court to consider whether HRCP Rule 60(b) provides such authority. Moreover, DHHL's administrative rules do not appear to contain a provision that would allow it to turn to the HRCP for guidance where its own rules are silent in any event. See HAR ~~chapter~~ Title 10. By contrast, the PUC's HAR § 16-601-1 expressly contemplates turning to the HRCP where the PUC's rules are silent. Therefore, Tanaka is limited to its unique facts. Tanaka does not compel the conclusion that this court lacks jurisdiction over this appeal.

HECO next argues that LOL's motion for relief was a collateral attack on Order No. 32600. We disagree. A collateral attack is "an attempt to impeach a judgment or decree in a proceeding not instituted for the express purpose of annulling, correcting or modifying such a judgment or decree." HELCO, 145 Hawai'i at 11-12, 445 P.3d at 683-84 (citation omitted). The "collateral attack doctrine is implicated when an independent suit seeks to impeach a judgment entered in a prior suit." Id. It applies "in situations in which a second lawsuit has been initiated challenging a judgment or order obtained from

35

a prior, final proceeding." Id. In this case, LOL's motion for relief was submitted in the same proceeding that generated Order No. 32600; it is not an "independent suit" or a "second lawsuit" attacking a prior proceeding. See also PennyMac Corp. v. Godinez, 148 Hawai'i 323, 329, 474 P.3d 264, 270 (2020) ("A Rule 60(b) motion is therefore not a 'collateral attack' – the purpose of Rule 60(b) is to provide a mechanism for challenging a final judgment.").

Correlatively, LOL's motion for relief was brought within the same contested case proceeding. Therefore, LOL is correct in arguing that it is a person aggrieved by Order No. 37074, which it brought under an HRCP Rule 60(b) motion challenging Order No. 32600 in a contested case proceeding, in which it was a participant. See HELCO, 145 Hawai'i at 21, 445 P.3d at 693 (holding that in order to appeal an agency decision, an appellant must be (1) "a person aggrieved . . . by a final decision and order in a contested case," and (2) "the aggrieved person must have participated in the contested case from which the decision affecting him resulted"). We have jurisdiction over this appeal.

## III. Standards of Review

### A. Direct Appeal

This court reviews direct appeals from PUC decisions under HRS § 91-14(g), which states the following:

36

> Upon review of the record, the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
> (1) In violation of constitutional or statutory provisions;
> (2) In excess of the statutory authority or jurisdiction of the agency;
> (3) Made upon unlawful procedure;
> (4) Affected by other error of law;
> (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
> (6) Arbitrary, capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

"Conclusions of law are reviewed de novo, pursuant to subsections (1), (2) and (4); questions regarding procedural defects are reviewable under subsection (3); findings of fact (FOF) are reviewable under the clearly erroneous standard, pursuant to subsection (5); and an agency's exercise of discretion is reviewed under the arbitrary and capricious standard, pursuant to subsection (6)." HELCO, 145 Hawai'i at 10-11, 445 P.3d at 682-83 (citation omitted). "Mixed questions of law and fact are '"reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case."'" Id. (citation omitted).

## B. Interpretation of Statutes

"We review the . . . interpretation of a statute de novo." State v. Pacheco, 96 Hawai'i 83, 94, 26 P.3d 572, 583 (2001). Our statutory construction is guided by established rules:

37

> When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

96 Hawai'i at 94, 26 P.3d at 583 (citations omitted).

## C.  Interpretation of Administrative Rules

In interpreting the HAR,

> [t]he general principles of construction which apply to statutes also apply to administrative rules.  As in statutory construction, courts look first at an administrative rule's language.  If an administrative rule's language is unambiguous, and its literal application is neither inconsistent with the policies of the statute the rule implements nor produces an absurd or unjust result, courts enforce the rule's plaining meaning.

Kaleikini v. Yoshioka, 128 Hawai'i 53, 67, 283 P.3d 60, 74 (2012) (citations omitted).

## D.  Interpretation of Court Rules

An appellate court reviews the interpretation of court rules de novo.  Sierra Club v. Dep't of Transp., 120 Hawai'i 181, 197, 202 P.3d 1226, 1242 (2009).

## E.  Interpretation of Contracts

"As a general rule, the construction and legal effect to be given a contract is a question of law freely reviewable by an appellate court."  Casumpang v. ILWU Local 142, 108 Hawai'i 411, 420, 121 P.3d 391, 400 (2005) (cleaned up).

## IV.  Discussion

On appeal, LOL raises the following points of error:

> The PUC reversibly erred in the following ways:

38

> (1)  by concluding it lacked jurisdiction to consider
> [LOL's] motion for relief on the basis that it is untimely
> under a strict construal of statutes creating a right of
> appeal and rules governing reconsideration.
> . . . .
> (2) by treating [LOL's] motion for relief pursuant to HAR §
> 16-601-1 as an untimely filed or failed motion for
> reconsideration.
> . . . .
> (3)  by failing to re-open proceedings to address HECO and
> NPM's failure to obtain land rights under amended PPA §
> 11.2 or, alternatively, to strictly construe parties'
> failure to obtain site control as required by Part IV.B.8
> of the competitive bidding framework, from which parties
> had obtained a waiver.
> . . . .
> (4) by treating the approval of the amended PPA as a
> contract between private parties and engaging in contract
> interpretation in concluding the meaning of the amended PPA
> approval.
> . . . .
> (5)  by delegating its powers to interpret its order
> approving the PPA and amendments to the same private
> parties – HECO and NPM – as a consequence of concluding
> that its approval of the PPA can be amended through
> "contractual mechanisms" available exclusively to the
> private parties to the contract.

Briefly restated, LOL argues that the PUC's administrative rules are "silent" on providing relief from an order in these circumstances.  Therefore, LOL argues that, under HAR § 16-601-1, the PUC should have turned to HRCP Rule 60(b)(4), (5), and (6) to grant LOL relief.

LOL argues that under HRCP Rule 60(b)(4), Order No. 32600 is "void" because (1) NPM failed to timely obtain an ITL under the PPA's terms, and (2) the PUC failed to analyze the GHG emissions impact of the wind farm project under HRS § 269-6(b), which violates LOL's due process right to a clean and healthful environment.  LOL contends that under HRCP Rule 60(b)(5), it is "no longer equitable" for Order No. 32600 to "have prospective

application" with regard to wind prices, because (1) a 2017 Scientific American blog article stated that wind prices had fallen to 2 cents per kWh, making the PPA's 14.998 cents per kWh price unreasonable, and (2) the PUC failed to analyze the GHG emissions impact of the wind farm project under HRS § 269-6(b). Lastly, LOL maintains that under HRCP Rule (60)(b)(6), the PUC's failure to consider GHG emissions constitutes "any other reason justifying relief from the operation of the" order.

Both HECO and the PUC argue that HAR § 16-601-1 permits, but does not require, the PUC to turn to the HRCP for guidance. Both argue that the PUC did not need to turn to HRCP Rule 60(b) because the PUC's administrative rules are not "silent" on providing relief from an order. Specifically, HAR § 16-601-137 allows motions for rehearing or reconsideration of a PUC order to be filed within 10 days of service of the order. Both HECO and the PUC also argue that LOL could have appealed Order No. 32600 within 30 days, under HRS § 269-15.5, which governs appeals from PUC decisions and orders. The PUC further points out that LOL could have filed a formal complaint under HAR § 16-601-67 (2019), or a petition for a declaratory order under HAR § 16-601-159 (2019). Moreover, both HECO and the PUC also argue that even if the PUC did turn to HRCP Rule 60(b) for guidance, LOL's motion for relief was not filed within a reasonable time.

Additionally, HECO asserts that, as a factual matter, the

40

ITL was not obtained too late, because it was a Governmental Approval that was obtained prior to the commercial operations date, as the PPA required. Moreover, both HECO and the PUC argue, LOL lacks standing to assert an alleged breach of the terms of the PPA, because only HECO and NPM are parties to the PPA, and because LOL is not an intended third-party beneficiary of the PPA.

**A. The PUC's rules are silent on the manner in which a participant can obtain relief from an order due to facts that develop after the time to appeal the order has passed.**

Under HAR § 16-601-1, the PUC has the discretion, but is not required, to turn to the HRCP for guidance where its rules are silent. Again, HAR § 16-601-1 states, in relevant part, "Whenever this chapter [i.e., HAR chapter 16-601] is silent on a matter, the commission or hearings officer may refer to the Hawaii Rules of Civil Procedure for guidance." HECO and the PUC argue that the PUC rules are not silent on the relief LOL sought. Specifically, they contend HAR § 16-601-137 applies, which covers motions "seeking any change in a decision [or] order," such as "reconsideration, rehearing, further hearing, or modification, suspension, vacation, or a combination thereof." Such a motion must be filed 10 days after service of the decision or order. (Alternatively, they contend LOL could have timely appealed Order No. 32600 under HRS § 269-15.5, which states that "an appeal from an order of the [PUC] under this

chapter shall lie, subject to chapter 602, in the manner provided for civil appeals from the circuit court," which, under chapter 602 at that time, required appeal to the ICA within 30 days after entry of the order.)  LOL, on the other hand, argues that there is no PUC rule under which it could have sought relief from an order based on circumstances that developed after the time for filing a motion for rehearing or reconsideration (or an agency appeal) has passed; therefore, the PUC should have turned to HRCP Rule 60(b).

In this case, neither HAR § 16-601-137 nor HRCP Rule 60(b) alone provides for the relief LOL sought.  To reiterate, LOL based its motion for relief on three claims: (1) the parties untimely obtained an ITL in May 2018, in violation of the terms of the PPA, which therefore voided Order No. 32600; (2) 14.998 cents per kWh of wind energy was unreasonable, in light of a 2017 Scientific American blog article stating that wind energy prices had dropped to 2 cents per kWh, and (3) the PUC's Order No. 32600 contained no findings of fact or conclusions of law about GHG emissions, in violation of HRS § 269-6(b).

On one hand, LOL could have raised the absence of a GHG emissions analysis in Order No. 32600 in a timely motion for rehearing or reconsideration under HAR § 16-601-137 or a timely appeal under HRS § 269-15.5.  In 2011, HRS § 269-6(b) was amended to require the PUC to explicitly consider the effect of

a project like the wind farm on GHG emissions. See 2011 Haw. Sess. Laws Act 109, § 1 at 287-88 (newly mandating the PUC to "explicitly consider, quantitatively or qualitatively, the effect of the State's reliance on fossil fuels on," inter alia, "greenhouse gas emissions.") The absence of a GHG emissions analysis is evident on the face of Order No. 32600. Order No. 32600 was filed on December 31, 2014, well after this amendment was passed. Thus, as to the GHG emissions issue, the PUC did not abuse its discretion in declining to re-open Order No. 32600 under HRCP Rule 60(b)(4), (5), or (6) to address the GHG emissions issue. A motion under HRCP Rule 60(b) "is not a substitute for a timely appeal from the original judgment." Stafford v. Dickison, 46 Haw. 52, 57 n.4, 374 P.2d 665, 669 n.4 (1962) (citations omitted).

On the other hand, two of these bases for re-opening Order No. 32600 could not have been timely raised in a motion for rehearing or reconsideration under HAR § 16-601-137 (or timely appealed under HRS § 269-15.5). First, the parties did not obtain an ITL until May 2018, and this fact could not have been known 10 days (or 30 days) after the PUC issued Order No. 32600. Second, the 2017 Scientific American blog article about wind energy prices did not exist 10 days (or 30 days) after the PUC issued Order No. 32600. Therefore, LOL could not have used HAR § 16-601-137 (or HRS § 269.15.5) to seek relief on these bases.

The PUC's administrative rules are silent as to how to seek relief from a PUC order based on facts like these that develop after the 10-day rehearing or reconsideration date (and the 30-day appeal date) have passed.  In these circumstances, LOL reasonably argues that relief under HRCP Rule 60(b)(4) or (5) may be available.  We further examine these subsections below.

## B.   HRCP Rule 60(b) generally, and subsections (4) and (5) specifically

HRCP Rule 60 is titled "Relief from Judgment or Order." Subsection (b) of the rule is titled "Mistakes; inadvertence; excusable neglect; newly discovered evidence; fraud, etc.," and it states the following, in relevant part:

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken. . . .

The ITL and wind price issues concern Rule 60(b)(4) ("the judgment is void") and (5) ("it is no longer equitable that the judgment should have prospective application"), respectively.

44

As to HRCP Rule 60(b)(4), this court has said, "The determination of whether a judgment is void is not a discretionary issue.  It has been noted that a judgment is void only if the court that rendered it lacked jurisdiction of either the subject matter or the parties or otherwise acted in a manner inconsistent with due process of law."  Carbonel, 93 Hawai'i at 473, 5 P.3d at 463  (quoting In re Hana Ranch Co., 3 Haw. App. 141, 146, 642 P.2d 938, 941 (1982)) (cleaned up).  The question on appeal is whether an allegedly untimely ITL somehow "voids" Order No. 32600.

Next, HRCP Rule 60(b)(5) "is based on the historic power of a court of equity to modify its decree in the light of changed circumstances."  11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2863 (3d ed. 2021).  Wright & Miller explain that Rule 60(b)(5) is not a substitute for an appeal.  It does not allow "re-litigation of issues that have been resolved by the judgment."  Id.  Instead, the rule refers to "some change in conditions that makes continued enforcement inequitable."  Id.  The burden is on the movant to "demonstrate extraordinary circumstances justifying relief."  Id.  The question on appeal is whether a 2017 Scientific American blog article reporting on a nationwide decrease in wind energy prices constitutes "extraordinary circumstances justifying relief."

45

A motion brought under HRCP Rule 60(b) is also subject to various deadlines.  Unlike subsections (1), (2), and (3) of HRCP Rule 60, which are all subject to a one-year deadline, a motion brought under subsection (5) is subject to "a reasonable time." A motion brought under subsection (4) may be brought "regardless of how much time has passed between entry of judgment and filing the motion."  <u>Bank of Hawaii v. Shinn</u>, 120 Hawai'i 1, 11, 200 P.3d 370, 380 (2008).  Where there are "exceptional situations," however, it appears the "reasonable" time limit applies.  See <u>Calasa v. Greenwell</u>, 2 Haw. App. 395, 398, 633 P.2d 553, 554 ("Except in exceptional situations, there is no time limit on an attack on a judgment as void.") (citation omitted).  A "reasonable time" calls for an inquiry into "the explanation for the delay in applying for reinstatement of the action."  <u>Hawai'i Housing Authority v. Uyehara</u>, 77 Hawai'i 144, 149, 883 P.2d 65, 70 (1994).

**C.  The merits of LOL's 60(b)(4) and (5) arguments**

We next discuss whether the PUC abused its discretion in declining to consider LOL's motion for relief under HRCP Rule 60(b)(4) and (5).

1.    **The PUC did not abuse its discretion in declining to turn to HRCP Rule 60(b)(4) for guidance with respect to LOL's claim that the parties were late in obtaining an ITL.**

Again, under HRCP Rule 60(b)(4), an order is "void only if the court that rendered it lacked jurisdiction of either the subject matter or the parties or otherwise acted in a manner inconsistent with due process of law."  Carbonel, 93 Hawai'i at 473, 5 P.3d at 463 (quoting Hana Ranch Co., 3 Haw. App. at 146, 642 P.2d at 941).  The question on appeal is whether an allegedly untimely obtained ITL somehow "voids" Order No. 32600. We hold that it does not.  The "voiding" of the PPA and Order No. 32600 that LOL sought to prove did not involve defects in jurisdiction or a due process violation, as HRCP Rule 60(b)(4) requires.  See Carbonel, 93 Hawai'i at 473, 5 P.3d at 463. Rather, LOL sought to show that the PPA was voided by its own terms due to the parties' alleged failure to obtain an ITL under the deadlines set forth in the PPA, and, therefore, the PUC's Order No. 32600 approving the PPA was void.

In service of this reading of the PPA's terms, LOL contends that the parties' waiver from the Competitive Bidding Framework required the PUC to "strictly construe" the representations made by the parties in the PPA regarding obtaining the ITL.  LOL's construction of the PPA and the Competitive Bidding Framework is incorrect.  First, LOL argues that NPM's alleged failure to

47

timely obtain an ITL violated "the threshold requirements of 'site control' imposed by the Competitive Bidding Framework." LOL quoted Part IV.B.8 of the Competitive Bidding Framework for the following "requirement" of "site control":

> As part of the design process, the utility shall develop and specify the type and form of threshold criteria that will apply to bidders, including the utility's self-build proposals.  Examples of potential threshold criteria include requirements that bidders have site control, maintain a specified credit rating, and demonstrate that their proposed technologies are mature.

This provision, however, applies to criteria that a utility may impose when considering bidders during the competitive bidding process.  HECO and NPM are exempt from the Competitive Bidding Framework; therefore, this provision simply does not apply, either to impose a requirement of "site control" upon NPM or to support LOL's non sequitur that waiver from the Competitive Bidding Framework requires the PUC to "strictly construe" the PPA.

LOL further misconstrues the PPA in arguing that the ITL was a "Land Right" under the PPA.  The PPA defines a "Land Right" as "[a]ll easements, rights of way, licenses, leases, surface use agreements and other interest or rights in real estate."  An ITL is not a right in real estate.  LOL construes the ITL to be a land right, however, to establish an earlier date under the PPA by which NPM was obligated to obtain the ITL.  Specifically, under section 11.2 of the PPA, NPM was required to obtain all "land rights" within 120 days from the execution date

of the PPA. (The initial PPA was executed on October 3, 2013, and the Amended PPA was executed on August 12, 2016.) The ITL was not obtained until May 2018.

By contrast, HECO and the PUC argue that the ITL was a "Governmental Approval" under the PPA. A "Governmental Approval" is defined as

> All permits, licenses, approvals, certificates, entitlements and other authorizations issued by Governmental Authorities, as well as any agreements with Governmental Authorities, required for the construction, ownership, operation and maintenance of the Facility and the Company-Owned Interconnection Facilities, and all amendments, modifications, supplements, general conditions and addenda thereto.

An ITL is a governmental approval issued by the BLNR pursuant to HRS Chapter 195D. As a "Governmental Approval," NPM was responsible for procuring it under the terms of Article 22(D) of the PPA, which state, "As of the commencement of construction, Seller shall have obtained . . . all Governmental Approvals necessary for the construction, ownership, operation and maintenance of the Facility." As for when the "commencement of construction" was to take place, Attachment L to the Amended PPA stated that December 31, 2017 was the "Construction Start Date," at least as to the overhead powerlines, whereby "Seller shall obtain and provide Company all permits, licenses, easements and approvals to construct the Company-Owned Interconnection Facilities.") (HECO has notified this court that "[c]onstruction of all eight turbines that comprise the project

49

was completed in late February 2020," and that the project "remains on track to commence testing activities in June and to be operational later this summer," meaning summer 2020.)

Regarding how the PPA may be voided, Article 12.5(B) allows HECO, prior to the effective date, to "declare the Agreement null and void if . . . Seller is in breach of any of its representations, warranties and covenants under the Agreement, including but not limited to, (1) the provisions of Section 22.2(C) requiring Seller to have obtained all Land Rights necessary for the construction, ownership, operation and maintenance of the Facility for the Initial Term. . . ."  As explained above, however, the ITL was a "Governmental Approval," so Article 12.5(B), which references "Land Rights," does not apply.

The PPA also allowed HECO to terminate the agreement under Article 13.4(B) if NPM missed "guaranteed project milestones," but NPM was also allowed 90-day grace periods in those instances, under Article 13.3.  If NPM still did not meet a guaranteed project milestone even with the applicable grace period, article 13.4(B) of the PPA allowed HECO the right to terminate the Agreement after 180 days of NPM's failure.  Thus, contrary to LOL's contention, there is no provision in the PPA under which the PPA necessarily becomes void due to a late Governmental Approval.  Therefore, contrary to LOL's argument,

it does not follow that the PUC's Order No. 32600 was void for having approved the PPA.

Lastly, the PUC characterized LOL as lacking "standing" to raise an alleged breach of the PPA because LOL was neither a party nor an intended third-party beneficiary.  We cannot say such an observation is incorrect, as LOL's sole basis for "voiding" Order No. 32600 rested on an attempt to demonstrate that the parties had breached the PPA.  As explained above, the conditions under which breach occur, and the remedies for breach, were terms of the PPA that applied only to HECO and NPM. In short, LOL's attempt to "void" the PPA and Order No. 32600 under HRCP Rule 60(b)(4) is unavailing.  Therefore, the PUC did not abuse its discretion in declining to turn to that subsection for guidance in reviewing LOL's claim that the parties were late in obtaining an ITL.

**2.  The PUC did not abuse its discretion in declining to turn to HRCP Rule 60(b)(5) for guidance on addressing LOL's wind energy price claim, as the 2017 Scientific American blog article did not constitute "extraordinary circumstances" entitling LOL to relief.**

Lastly, LOL argues that the PUC should have turned to HRCP Rule 60(b)(5) to guide it in analyzing the claim that the PPA's 14.998 cent per kWh wind energy price was unreasonable, in light of a 2017 Scientific American blog article stating that wind energy nationwide could be as inexpensive as two cents per kWh. Although Rule 60(b)(5) allows modification of orders due to

51

changed circumstances, the "burden is on the movant to demonstrate <u>extraordinary</u> circumstances justifying relief."  11 Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 2863 (emphasis added).  In this case, the blog article does not demonstrate such "extraordinary circumstances." Again, the blog post summarized the U.S. DOE's Wind Technologies Market Report for 2017.  Regarding the two-cent figure, the DOE noted that it was a "nationwide average," "dominated by projects that hail from the lowest-priced region, in the central United States."  As HECO pointed out at oral argument, Hawai'i was excluded from the DOE's report.  The DOE footnoted within its report that data about "U.S. wind power capacity located in Hawaii, Alaska, and Puerto Rico is typically excluded from [its] analysis sample due to the unique issues facing wind development in these three isolated states/territories." https://www.energy.gov/sites/default/files/2018/08/f54/2017_wind _technologies_market_report_8.15.18.v2.pdf at 68. [https://perma.cc/A7PQ-LCLJ] Therefore, the two-cent figure is irrelevant in this case.

Further, "[t]he burden of establishing an abuse of discretion [in denying an HRCP Rule 60(b)] motion is on the appellant, and a strong showing is required to establish it." <u>PennyMac Corp.</u>, 148 Hawai'i at 327, 474 P.3d at 268 (citation omitted).  LOL's blog article does not provide the requisite

"strong showing" necessary for this court to conclude that the PUC abused its discretion in declining to afford LOL relief under HRCP Rule 60(b)(5).

### V.  Conclusion

For the foregoing reasons, the PUC did not abuse its discretion in declining to turn to HRCP Rule 60(b) for guidance in addressing LOL's motion for relief from Order No. 32600. Therefore, PUC Order No. 37074 is affirmed.

| | |
|---|---|
| Lance Collins<br>(Bianca Isaki with him<br>on the briefs)<br>for appellant | /s/ Mark E. Recktenwald<br><br>/s/ Paula A. Nakayama<br><br>/s/ Sabrina S. McKenna |
| Randall C. Whattoff<br>(Kamala S. Haake with him<br>on the brief)<br>for appellee HECO | /s/ Michael D. Wilson<br><br>/s/ Christine E. Kuriyama |
| Mark J. Kaetsu<br>(Caroline C. Ishida with him<br>on the brief)<br>for appellee PUC | |

